[Cite as *Besancon v. Cedar Lane Farms, Corp.*, 2017-Ohio-347.]

STATE OF OHIO       )
                           )ss:
COUNTY OF WAYNE   )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

WILLIAM BESANCON, et al.

     Appellees/Cross-Appellants

     v.

CEDAR LANE FARMS, CORP., et al.

     Appellants/Cross-Appellees

C.A. No.     16AP0003

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.    2014 CVC A000251

DECISION AND JOURNAL ENTRY

Dated: January 31, 2017

WHITMORE, Judge.

**{¶1}** Cedar Lane Farms, Corp. ("Cedar Lane") appeals from the judgment of the Wayne County Court of Common Pleas. William and Sandy Besancon ("the Besancons") cross-appeal. This Court affirms in part and reverses in part.

I.

**{¶2}** This appeal involves a series of agreements between Cedar Lane and the Besancons or their predecessors. In 1986, Cedar Lane and Mr. Besancon's parents entered into a 10-year lease agreement for certain property owned by Mr. Besancon's parents. The leased property was identified by the parties as parcels A and B in a drawing attached to the lease. The agreement provided the option to renew the lease for two additional 10-year periods. In 1992, the property was transferred to the Besancons. In 1996, Cedar Lane and the Besancons executed their first "Memorandum of Lease Extension."

{¶3}    In 2006, the Besancons filed an eviction action against Cedar Lane.  The parties settled that lawsuit and had the terms of their settlement transcribed by a stenographer.  The transcribed settlement stated that "the parties will enter into a Memorandum Extension which for the period of 2006 to 2016 will require rent in the amount of $1,000 per month[.]"  It continued, "there will be a $2,400 payment paid today for consideration of a lease extension for an additional five-year period extending from 2017 to 2021, and also in consideration of that extension a second payment will be made * * * by June 30th of 2007 in the amount of $3,000."  The transcribed settlement then addressed the rent amount for the extension period and the disposition of various assets upon the lease's termination.

{¶4}    Thereafter, the parties executed a "Memorandum of Second Lease Extension" ("Second Lease Extension").  The Second Lease Extension provided for rent "payable in monthly installments of $1,000.00 on or before the 18th day of each month * * * [p]rovided that the $3,000.00 payable for February, March and April 2006 may be paid by June 30, 2006."  Addressing the option for the additional five-year renewal, it provided:  "In consideration of this additional term option, Lessee has paid to Lessor the sum of $2,400.00, the receipt of which Lessor acknowledges."  The disposition of the assets upon the lease's termination was different than what was stated in the transcribed settlement.  The Second Lease Extension was signed by all the parties, apparently without any further discussion of the differences between it and the transcribed settlement.

{¶5}    In 2010, Cedar Lane approached the Besancons concerning an algae research project that Touchstone Research Laboratory, Ltd. ("Touchstone") proposed to do on the property.  The Besancons agreed to allow the research, and Cedar Lane entered into a lease agreement with Touchstone.  Although there was no written agreement between Cedar Lane and

the Besancons concerning this, Cedar Lane paid the Besancons $200 per month during this project. Towards the end of the project, Touchstone issued Cedar Lane a check including $5,000 that the Besancons claim was intended for them.

{¶6} The Besancons filed the current action against Cedar Lane in 2014. The Besancons sought (1) a declaration "that the [Besancons] have the sole and exclusive right to the 'North Field' under the original and subsequent lease extensions;" (2) a declaration "that the 3 year oral lease has expired and that [Cedar Lane] ha[s] no rights in the 'North Field' and possession is returned to [the Besancons];" and (3) reformation of the Second Lease Extension "to conform with the true understanding of the parties." Cedar Lane filed counterclaims for (1) intentional interference with a contractual relationship; (2) breach of contract; and (3) declaratory judgment concerning the area covered by the lease and its exercise of its option to extend the lease until 2021. Thereafter, the Besancons amended their complaint adding a claim for conversion and also seeking punitive damages.

{¶7} The parties filed cross-motions for summary judgment. Finding "disputes of material fact," the trial court denied the motions for summary judgment. The matter proceeded to a bench trial. Mr. Besancon, Mrs. Besancon, and Thomas Machamer, who is the president of Cedar Lane, testified at the trial. The trial court "declare[d] [the Besancons] have the sole and exclusive right to the 'North Field' under the original and subsequent lease extensions * * * [and that] possession of the 'North Field' is returned to [the Besancons] as [Cedar Lane's] oral lease has expired." The trial court reformed the Second Lease Extension concerning the consideration for the option to extend the lease until 2021 and the disposition of assets upon termination of the lease. The trial court further found that Cedar Lane had converted $5,000 belonging to the Besancons, which Cedar Lane was ordered to pay with interest. On Cedar Lane's counterclaims,

the court found that the Besancons had not interfered with Cedar Lane's contractual relationship with Touchstone and that the Besancons had not breached the lease's covenant of quiet enjoyment. The court further found that Cedar Lane had not paid the full consideration to extend the lease until 2021 and declared that the lease expired on January 31, 2016. Finally, the court "declare[d] that Parcel B is included in the original and subsequent lease extensions, however, Parcel B did not include the North Field * * *." Upon Cedar Lane's motion and the posting of a bond, the trial court stayed its judgment pending this appeal.

{¶8} Cedar Lane has appealed, raising seven assignments of error. The Besancons have cross-appealed, raising one assignment of error. For ease of discussion, we address some of the assignments of error jointly.

II.

Cedar Lane's Assignment of Error Number One

THE TRIAL COURT ERRED BY DENYING CEDAR LANE'S MOTION FOR SUMMARY JUDGMENT AS TO THE AREA CONTAINED IN PARCEL B.

{¶9} In its first assignment of error, Cedar Lane contends that the trial court erred in denying its motion for summary judgment. According to Cedar Lane, the trial court incorrectly looked outside the four corners of the lease agreement to determine which land was encompassed within the agreement.

{¶10} The original lease agreement provided that a legal description of the leased premises was "attached hereto and incorporated herein as Exhibit A, with that portion of the premises covered by the terms of this Lease described in the drawing attached hereto as Exhibit B." Exhibit A appears to be the legal description of the entire 102.25 acre farm owned by the Besancons. Exhibit B is a drawing of four parcels labeled A, B, C, and D. The parties agree that the parcels labeled "A" and "B" are the areas leased by Cedar Lane. The parties disagree,

however, over which land is included in parcel B. This is because the letter "B" is written inside a small rectangle that is centered within another larger rectangle.

{¶11} Upon review of the record, we conclude that this issue is moot. The Ohio Supreme Court has held that "[a]ny error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made." *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150 (1994), syllabus. At trial, Mr. Besancon testified that only the smaller rectangle was included in parcel B, noting that he had continued farming and paying the taxes on a significant part of the larger rectangle, which the parties referred to as North Field, through the duration of the lease. He also noted that, when Cedar Lane wanted to use part of the North Field, it negotiated with him to pay an additional monthly fee, which it would not have done if it was already leasing that land. Upon review of the evidence, we conclude that the drawing attached to the lease agreement is ambiguous and that the testimony at trial demonstrated that there was a genuine issue of material fact over which land is included in parcel B. Accordingly, under *Whittington*, any error with respect to the trial court's summary judgment decision was rendered moot by the subsequent trial. Cedar Lane's first assignment of error is overruled.

### Cedar Lane's Assignment of Error Number Two

THE TRIAL COURT ERRED BY FINDING THAT THE BESANCONS HAVE THE SOLE AND EXCLUSIVE RIGHT TO THE "NORTH FIELD" UNDER THE ORIGINAL AND SUBSEQUENT LEASE EXTENSIONS, AND THAT THE "NORTH FIELD" WAS NOT INCLUDED IN PARCEL B, AND THAT POSSESSION OF THE "NORTH FIELD" BE RETURNED TO [THE] BESANCONS.

{¶12} In its second assignment of error, Cedar Lane argues that the trial court's decision concerning Parcel B and the North Field was against the manifest weight of the evidence. It also

argues that the trial court's decision should be reversed because the court failed to adequately describe the boundaries of the North Field and "the parties do not have a common understanding of the term the 'North Field.'"

{¶13} In determining whether a trial court's ruling is against the manifest weight of the evidence:

> "'The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'"

(Alterations sic.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶14} In its attempt to resolve the ambiguity over parcel B, the trial court looked to other provisions within the lease itself. The lease stated that the initial rent would be "an amount equal to the current real estate taxes paid by Lessor attributable to the buildings and real estate that encompass the leased premises." Mr. Besancon testified that Cedar Lane paid taxes on the smaller rectangle that contained the letter B in it and that it paid the taxes for an area within the larger rectangle that was directly south of the small rectangle. He also testified that he and his wife had paid taxes on the North Field since "tax year [19]91, maybe [19]92" when they purchased the property. Mrs. Besancon also testified that the Besancons paid the taxes on the North Field. Mr. Machamer conceded that the Besancons paid taxes on the North Field "as of 1991, prior to that, [he was] not sure." Mr. Machamer also testified that he attempted to put the taxes for the North Field into Cedar Lane's name in 2013 because he "was using the property" at that time.

{¶15} The trial court also heard other testimony regarding the use of the North Field. Mr. Besancon testified that he used the area to grow crops for his cattle. He stated that the Besancons had farmed it "[c]ontinuously" from 1986 to 2011. Mrs. Besancon testified that "[i]t was always part of [their] farm * * * always hay or corn." Regarding the Besancons' farming of North Field, Mr. Machamer testified that, although North Field is included in parcel B, he had allowed the Besancons to farm it from 1986 to 2011 because he "had no use for it" at that time.

{¶16} Mr. Besancon testified that the use of the North Field changed in 2011 after Cedar Lane approached him concerning Touchstone's proposed algae research project. He testified that he agreed to rent the North Field for three years at a rate of $200 per month. Although there was no written agreement between the Besancons and Cedar Lane concerning this arrangement, Mr. Besancon indicated there was an agreement because he "shook his hand." On cross-examination, Mr. Machamer confirmed that he agreed to pay $200 per month for the use of the North Field, but stated this payment was a "[c]ourtesy" to keep the Besancons "off [his] back" for the land that they would not be able to farm anymore.

{¶17} Given the evidence before it, we cannot say that the trial court clearly lost its way in determining that the North Field was not included in parcel B or covered by the original lease. *See State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus (holding that the "weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.").

{¶18} Regarding whether the trial court's judgment adequately described the boundaries of the North Field, a review of the transcript belies Cedar Lane's argument. On direct examination, Mr. Besancon indicated that the North Field was the area between the small box with the B in it and the access road to the north. Similarly, Mr. Machamer testified that "[t]he

[N]orth [F]ield would be between the access road and the B, the offices and stuff." Because the parties had a similar understanding about the parameters of the North Field, any error in the trial court's description of the area is harmless. *See* Civ.R. 61. Cedar Lane's second assignment of error is overruled.

<u>Cedar Lane's Assignment of Error Number Three</u>

THE TRIAL COURT ERRED BY DENYING CEDAR LANE'S MOTION FOR SUMMARY JUDGMENT AS [TO] THE REFORMATION OF THE SECOND LEASE EXTENSION BASED ON MUTUAL MISTAKE.

<u>Cedar Lane's Assignment of Error Number Four</u>

THE TRIAL COURT ERRED BY REFORMING THE SECOND LEASE EXTENSION BASED ON MUTUAL MISTAKE BASED ON THE EVIDENCE PRESENTED.

**{¶19}** Cedar Lane initially argues that the trial court incorrectly reformed the Second Lease Extension based on mutual mistake because the Besancons did not plead mutual mistake with particularity in their complaint, as required by Civil Rule 9(B). Cedar Lane, however, did not raise this argument below. It, therefore, has forfeited all but plain error on appeal. *See Rising v. Litchfield Twp. Bd. of Trustees*, 9th Dist. Medina No. 16CA0010-M, 2016-Ohio-6971, ¶ 16. The plain error doctrine is disfavored in civil appeals and is only applied in rare cases. *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus. Moreover, Cedar Lane has not argued plain error on appeal. "This Court will not engage in an analysis of plain error if an appellant fails to argue plain error on appeal." *K.L. v. D.M.*, 9th Dist. Medina No. 15CA0010-M, 2016-Ohio-338, ¶ 5.

**{¶20}** Cedar Lane next argues that the Besancons failed to establish that there was a mutual mistake concerning the Second Lease Extension. This Court has held that "[r]eformation based on mutual mistake is appropriate when the parties made the same mistake and understood

the contract as the complaint alleges it should have been." *General Tire, Inc. v. Mehlfeldt*, 118 Ohio App.3d 109, 115 (9th Dist. 1997). "The party alleging mutual mistake has the burden of proving its existence by clear and convincing evidence." *Id.* This Court reviews "whether the court applied the proper rule of proof and [whether] the evidence attains to that higher degree of probative value to constitute clear and convincing proof." *Frate v. Rimenik*, 115 Ohio St. 11, 18 (1926). Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶21} Upon review of the record, we conclude that the Besancons did not meet their burden. The issue is whether the parties were mutually mistaken over whether the Second Lease Extension properly integrated their previous oral agreement. According to the Besancons, the Second Lease Extension does not reflect the parties' oral agreement because it does not require Cedar Lane to pay $3,000 in consideration for extending the lease beyond 2016 over and above any monthly lease payments Cedar Lane was required to make. The Second Lease Agreement clearly does not require Cedar Lane to make an additional $3,000 payment. According to Cedar Lane, the party responsible for drafting the agreement, the reason the Second Lease Extension does not require the additional payment is because it believed an additional payment was not part of the parties' oral agreement. Regardless of whether Cedar Lane was mistaken about the terms of the parties' oral agreement, it was not mistaken about the fact that the Second Lease Extension does not require it to make an additional payment. The only parties that were mistaken over whether the Second Lease Extension required an additional payment were the Besancons, who

testified that they did not read the four-page document before signing it. The mistake over the terms of the Second Lease Extension, therefore, was unilateral, not mutual.

**{¶22}** This Court has held that a contract can be reformed even if a mistake is not mutual if "one party believes that a contract correctly integrates the agreement and the other party is aware that it does not[.]" *See Galehouse Constr. Co. v. Winkler*, 128 Ohio App.3d 300, 303 (9th Dist.1998). There is no evidence, however, that Cedar Lane was aware that the Second Lease Extension did not correctly integrate the parties' oral agreement. We, therefore, conclude that the trial court erred when it reformed the Second Lease Extension under the doctrine of mutual mistake. Cedar Lane's third and fourth assignments of error are sustained.

Cedar Lane's Assignment of Error Number Five

> THE TRIAL COURT ERRED BY FINDING THAT CEDAR LANE DID NOT PAY ALL SUMS REQUIRED TO BE PAID IN CONSIDERATION FOR THE EXTENSION OF THE TERM OF THE LEASE THROUGH JANUARY 31, 2021.

**{¶23}** In its fifth assignment of error, Cedar Lane argues that the trial court erred when it considered parol evidence in determining whether there was a mutual mistake. In light of our disposition of its third and fourth assignments of error, we conclude that this assignment of error is moot. We, therefore, decline to address it. *See* App.R. 12(A)(1)(c).

Cedar Lane's Assignment of Error Number Six

> THE TRIAL COURT ERRED BY FINDING THAT CEDAR LANE'S OPTION TO EXTEND THE TERM OF THE LEASE THROUGH JANUARY 31, 2021 WAS NULL AND VOID.

**{¶24}** In its sixth assignment of error, Cedar Lane argues that, even if the trial court was correct in finding that it was required to pay an additional $3,000 to extend the lease further, the court imposed the wrong remedy. In light of our disposition of Cedar Lane's third and fourth assignments of error, this assignment of error is also moot and will not be addressed. *Id.*

<u>Cedar Lane's Assignment of Error Number Seven</u>

THE TRIAL COURT ERRED BY FINDING THAT CEDAR LANE CONVERTED $5000.00.

**{¶25}** In its seventh assignment of error, Cedar Lane argues that the trial court erred in finding that it had converted $5,000 because (1) Touchstone made the check payable to Cedar Lane and (2) the Besancons failed to prove their right to the $5,000. "[C]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. General Motors Corp.*, 49 Ohio St.3d 93, 96, citing *Zacchini v. Scripps-Howard Broadcasting Co.*, 47 Ohio St.2d 224, 226 (1976). To prevail on a claim for conversion, a plaintiff must prove: "'(1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.'" *Kostyo v. Kaminski*, 9th Dist. Lorain No. 12CA010266, 2013-Ohio-3188, ¶ 12, quoting *Scott Charles Laundromat v. Akron*, 9th Dist. Summit No. 26125, 2012-Ohio-2886, ¶ 9, quoting *Keybank Natl. Assoc. v. Guarnieri & Secrest, P.L.L.*, 7th Dist. Columbiana No. 07CO46, 2008-Ohio-6362, ¶ 15. "'It is not necessary that the property be wrongfully obtained.'" *Kostyo* at ¶ 12, quoting *McCartney v. Universal Elec. Power Corp.*, 9th Dist. Summit No. 21643, 2004-Ohio-959, ¶ 14. "When property is otherwise lawfully held, '[a] demand and refusal * * * are usually required to prove the conversion * * *.'" (Alterations sic.) *Kostyo* at ¶ 12, quoting *Ferreri v. Goodyear Local No. 2 United Rubber, Cork, Linoleum & Plastic Workers of Am. Home Assn.*, 9th Dist. Summit No. 16311, 1994 WL 45740, *2 (Feb. 9, 1994), quoting *Ohio Tel. Equip. & Sales Inc. v. Hadler Realty Co.*, 24 Ohio App.3d 91, 94 (10th Dist.1985).

**{¶26}** In the present action, Mr. Besancon testified that he had "[n]umerous" discussions with Cedar Lane and Touchstone. He asserted that they agreed to a new one year lease extension

for Cedar Lane's use of part of the North Field and he "was going to get a $5,000.00 check from Touchstone, through [Cedar Lane] for [his] help of disbursing saltwater and some other things and the topsoil and other things that occurred." He indicated that the $5,000 was a fair amount to compensate him for his services. Mr. Besancon further testified that he asked Cedar Lane for the $5,000 and "he stated, he's not going to pay it to me[.]"

{¶27} The court was also presented documentary evidence regarding this $5,000 payment. In a text to Mr. Besancon, Mr. Machamer stated, "Touchstone will have your $5000., and [Cedar Lane] could do its $400 if we have a little more longevity." In an email to a Touchstone representative, Mr. Machamer wrote:

> With the September invoice I have included two other invoices for discussion for the lease extension.
> The first is a monthly lease rate of $1850 and a "$5000 consideration for the lease extension". [Another Touchstone representative] and I worked out this deal with the farmer [Mr. Besancon] to compensate him for things he thinks he was shorted during construction and pumping out the ponds last winter.

Finally, there was a check from Touchstone to Cedar Lane totaling $7,801.86, for invoices in the amounts of $5,000.00, $1,850.00, and $951.86.

{¶28} Mr. Machamer testified that "we thought we had a deal." He confirmed that Touchstone sent him $5,000 that "was intended to go [to Mr. Besancon]." But, he asserted that was "if we worked out a deal" and "without longevity" there was "[n]o deal."

{¶29} While Cedar Lane argues that the check was made payable to it, property need not be wrongfully *obtained* to be subject to conversion. *See Kostyo* at ¶ 12. The Besancons demonstrated their right to the $5,000 for services rendered and Cedar Lane's wrongful retention of it after they demanded it. Cedar Lane's seventh assignment of error is overruled.

<u>The Besancons' Cross-Assignment of Error</u>

THE TRIAL COURT ABUSED ITS DISCRETION IN NOT AWARDING PUNITIVE DAMAGES ON COUNT V OF PLAINTIFFS' AMENDED COMPLAINT.

**{¶30}** In their cross-assignment of error, the Besancons argue that they were entitled to punitive damages because Cedar Lane acted with actual malice in retaining the $5,000. We review a trial court's decision regarding punitive damages for an abuse of discretion. *InfoCision Mgt. Corp. v. Donor Care Ctr., Inc.*, 9th Dist. Summit No. 27034, 2016-Ohio-789, ¶ 40. An abuse of discretion indicates that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "Actual malice" for purposes of punitive damages is "'(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" *Calmes v. Goodyear Tire & Rubber Co.*, 61 Ohio St.3d 470, 473 (1991), quoting *Preston v. Murty*, 32 Ohio St.3d 334 (1987), syllabus.

**{¶31}** Although the Besancons presented testimony and evidence of their right to the $5,000, there was also evidence of Cedar Lane's belief that the payment was contingent upon a longer lease extension. The text message to Mr. Besancon requests "a little more longevity" and the email to the Touchstone representative refers to "$5000 consideration for the lease extension[.]" Mr. Machamer testified to his belief that "without longevity" there was "[n]o deal." Finally, Mr. Besancon conceded that, while the $5,000 was for work he performed, a "portion" of it was for the lease extension.

{¶32} Under these facts, we cannot say the trial court abused its discretion in declining to award punitive damages to the Besancons. The Besancons' cross-assignment of error is overruled.

## III.

{¶33} Cedar Lane's first, second, and seventh assignments of error are overruled. Cedar Lane's third and fourth assignments of error are sustained. Cedar Lane's fifth and sixth assignments of error are moot. The Besancons' cross-assignment of error is overruled. The judgment of the Wayne County Court of Common Pleas is affirmed in part, reversed in part, and this matter is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

BETH WHITMORE
FOR THE COURT

CARR, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

J. DOUGLAS DRUSHAL and DANIEL P. CALVIN, Attorneys at Law, for Appellants/Cross-Appellees.

BRYAN K. BARNARD, Attorney at Law, for Appellees/Cross-Appellants.